UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

RONALD WILEY,

                                    Plaintiff,

        v.

                                                        7:04-CV-1215

COMMISSIONER OF SOCIAL                     (J. Sharpe)
SECURITY,

                                     Defendant.
_____

APPEARANCES:                         OF COUNSEL:

CONBOY, McKAY LAW FIRM         PETER L. WALTON, ESQ.
Attorneys for Plaintiff

GLENN T. SUDDABY              WILLIAM H. PEASE
United States Attorney for the        Assistant U.S. Attorney
Northern District of New York
Attorney for Defendant

GUSTAVE J. DI BIANCO, Magistrate Judge

## REPORT-RECOMMENDATION

    This matter was referred to me for report and recommendation by the Honorable

Gary L. Sharpe, United States District Judge,  pursuant to 28 U.S.C. § 636(b) and

Local Rule 72.3(d).  This case initially proceeded in accordance with General Order

18, however, the file could not be located, and on April 8, 2005, I signed a stipulation,

remanding this action to the Commissioner in an attempt to locate the file or

reconstruct the file. (Dkt. No. 9).  On August 2, 2005, plaintiff's counsel moved to

remand for a de novo hearing and an award of interim benefits because the file had not

yet been found, and plaintiff was being prejudiced by the delay. (Dkt. No. 10).

    In the interim, however, the defendant filed her answer and the administrative

transcript, making the plaintiff's motion to remand moot. (Dkt. No. 12).  Plaintiff's counsel withdrew the motion to remand. (Dkt. No. 20).  On October 19, 2005, plaintiff filed a "Motion to Submit New Evidence." (Dkt. No. 18).  In addition to the motion, plaintiff's counsel filed plaintiff's "Brief" in accordance with General Order 18. (Dkt. No. 17).  Plaintiff's counsel included reference to the "new" evidence in his brief.

The "motion" to consider new evidence was inappropriate in various ways, however, the court issued an order, directing defense counsel to notify the court if defendant would be filing a response to plaintiff's motion. (Dkt. No. 22).  Defendant filed a brief in support of judgment on the pleadings, without specifically addressing plaintiff's motion. (Dkt. No. 23).  This court will consider both arguments in this report.

## ADMINISTRATIVE PROCEDURAL HISTORY

Plaintiff filed an application for disability insurance benefits on April 16, 2001, alleging disability as of June 29, 2000. Administrative Transcript (T) at 77-80.  His application was denied initially. (T. 55-58).  Because plaintiff's case was considered a "Disability Redesign Prototype Case," he was not required to ask for a reconsideration decision, but was informed that he could request a hearing. *Id.*  Plaintiff requested a hearing, which was held before an Administrative Law Judge (ALJ) on August 21, 2002. (T. 509-49).  The ALJ issued a decision on October 25, 2002, finding that plaintiff was not disabled. (T. 34-48).  On September 24, 2004, the ALJ's decision became the final decision of the Commissioner when the Appeals Council denied plaintiff's request for review. (T. 6-8).

## CONTENTIONS

Plaintiff makes the following claims:

1.   The court should grant plaintiff's motion to consider "new and material" evidence. (Dkt. No. 18)(plaintiff's motion to submit new and material evidence).

2.   The ALJ failed to properly assess plaintiff's allegations of pain. Plaintiff's Brief at 14-17 (Dkt. No. 17).

3.   The ALJ failed to accord the proper weight to the opinion of plaintiff's treating physician and failed to properly weigh the other medical evidence of record. Plaintiff's Brief at 17-21.

4.   The ALJ erred in finding that only two of plaintiff's impairments were severe. Plaintiff's Brief at 21-23.

5.   The ALJ failed to properly establish plaintiff's residual functional capacity (RFC) and "misinformed" the Vocational Expert (VE) regarding plaintiff's limitations. Plaintiff's Brief at 23-25.

Defendant does not address plaintiff's motion to consider new and material evidence, but argues that the Commissioner's decision is supported by substantial evidence, and the complaint may be dismissed.

## DISCUSSION

To be considered disabled, a plaintiff seeking disability insurance benefits or SSI disability benefits must establish that he is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months ...." 42 U.S.C. § 1382c(a)(3)(A).  In addition, the plaintiff's

> physical or mental impairment or impairments [must be] of such severity
> that he is not only unable to do his previous work but cannot, considering
> his age, education, and work experience, engage in any other kind of
> substantial gainful work which exists in the national economy, regardless
> of whether such work exists in the immediate area in which he lives, or
> whether a specific job vacancy exists for him, or whether he would be
> hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step process, set forth in 20 C.F.R. §§ 404.1520
and 416.920 to evaluate disability insurance and SSI disability claims.

> First, the [Commissioner] considers whether the claimant is currently
> engaged in substantial gainful activity.  If he is not, the [Commissioner]
> next considers whether the claimant has a "severe impairment" which
> significantly limits his physical or mental ability to basic work activities.
> If the claimant suffers such an impairment, the third inquiry is whether,
> based solely on medical evidence, the claimant has an impairment which
> meets or equals the criteria of an impairment listed in Appendix 1 of the
> regulations.  If the claimant has such an impairment, the [Commissioner]
> will consider him disabled without considering vocational factors such as
> age, education, and work experience; ... .  Assuming the claimant does
> not have listed impairment, the fourth inquiry is whether, despite the
> claimant's severe impairment, he has the residual functional capacity to
> perform his past work.  Finally, if the claimant is unable to perform his
> past work, the [Commissioner] then determines whether there is other
> work which the claimant can perform.

*Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982); *see* 20 C.F.R. §§ 404.1520,
416.920.

The plaintiff has the burden of establishing disability at the first four steps.
However, if the plaintiff establishes that his impairment prevents him from performing
his past work, the burden then shifts to the Commissioner to prove the final step.
*Bluvband v. Heckler*, 730 F.2d 886, 891 (2d Cir. 1984).

4

1.      **Scope of Review**

    In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision. *Rosado v. Sullivan*, 805 F. Supp. 147, 153 (S.D.N.Y. 1992) (citing *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987)).  A reviewing court may not affirm an ALJ's decision if it reasonably doubts whether the proper legal standards were applied, even if the decision appears to be supported by substantial evidence. *Johnson*, 817 F.2d at 986.  In addition, an ALJ must set forth the crucial factors justifying his findings with sufficient specificity to allow a court to determine whether substantial evidence supports the decision. *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984).

    A court's factual review of the Commissioner's final decision is limited to the determination of whether there is substantial evidence in the record to support the decision. 42 U.S.C. § 405(g); *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991). "Substantial evidence has been defined as 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Williams on behalf of Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988)(citations omitted).  It must be "more than a scintilla" of evidence scattered throughout the administrative record. *Richardson v. Perales*, 402 U.S. 389, 401 (1971)(quoting *Consolidated Edison Co. v. NLRB*, 197 U.S. 229 (1938)).

    "To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams*, 859 F.2d at 258. However, a reviewing court cannot substitute its interpretation of the administrative record for that of the Commissioner if the record contains substantial support for the

ALJ's decision. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972). *See also Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982), *cert. denied*, 459 U.S. 1212 (1983).

2.    **Facts**

   **A. Non-Medical Evidence**

   Plaintiff's most recent former work was for F.K. Gailey Company. (T. 117).  He worked for F.K. Gailey from 1986 until June 29, 1990, when he stopped working due to his impairments, involving pain in his left shoulder, neck, and back.  His work duties at F.K. Gailey included driving a truck and delivering fuel oil and propane.  He lifted and pulled heavy weights such as fuel hoses.  Plaintiff also stated in his work history form that his job included being a service technician, installing furnaces, and setting propane tanks.  He also wrote out estimates and bills. (T. 117).

   During the hearing, plaintiff testified that he could lift 25 pounds with his right arm, and five pounds frequently, but that he could not even lift a gallon of milk with his left arm. (T. 517).  He stated that the main side effect from his various medications was "tiredness." (T. 518).  Plaintiff stated that his day began at 5:00 a.m., when he got up and let the dogs outside so that they could run around. (T. 518).  He stated that he could put dishes in the dishwasher and accompanied his wife when she went shopping. (T. 518).

   Plaintiff also stated that he went to visit a neighbor periodically.  He stated that he could use a fork with his left hand if he was at the table so that he could rest his arm and move it back and forth. (T. 521).  However, plaintiff could not engage in

6

repetitive motions with his left hand and arm.  He stated that he had not tried to pick up a telephone, but he thought that it would cause him pain to put something up to his ear. (T. 521).  He testified that he could pass things back and forth between hands if he had to, but it would be painful, and that he was unable to open a door with his left hand. (T. 522-23).

Plaintiff is left-handed, and he stated that he could still write sloppily with his left hand.  He stated that he occasionally wrote checks when he went to the store, but that this activity would be painful if he had to put the checkbook up on a counter to write the check. (T. 524-25).  He also stated that he could drive for approximately 20 minutes and could dress himself with his right hand. (T. 526).  Plaintiff stated that he gave up his hobbies of hunting and four-wheeling. (T. 527).  Plaintiff also stated that he had problems concentrating because of the pain. (T. 527).

### B.  Medical Evidence of Record

The Administrative Record in this case is extremely lengthy.  In addition to the medical reports that were before the ALJ, plaintiff's counsel submitted a substantial number of medical reports to the Appeals Council.  Plaintiff has seen approximately twenty doctors for his various medical impairments.  The left-sided impairment also affects his left arm and hand.  Part of the problem in this case was the difficulty that the medical personnel had in diagnosing the cause of plaintiff's pain.

Although plaintiff did not stop working until June 29, 2000, the medical reports indicate that as early as February of 1998, plaintiff complained to his family physician, Dr. Ella Remenson of chest wall muscular pain. (T. 163).  This pain was originally

thought to be related to cardiac symptoms since plaintiff had a family history of coronary artery disease. (T. 163). In April of 1999, plaintiff went to see Dr. Remenson, complaining of chest pain and pain in the muscle on top of his shoulder. (T. 159-61). The diagnosis was muscle sprain, related to plaintiff's job. (T. 161).

On May 13, 1999, Dr. Remenson stated that plaintiff was complaining about continuous pain in the left side of his neck, left shoulder, and muscles in the left arm pit. (T. 159). Dr. Remenson stated that this pain was probably associated with plaintiff's job because he was required to carry large hoses on his shoulder. At that time, plaintiff denied weakness or numbness. Plaintiff's range of motion was preserved, and he had no significant tenderness in his spine, but there was some tenderness under the scapula and left paraspinal muscles. (T. 159). Dr. Remenson stated that plaintiff's neck pain was most likely related to muscle spasm, secondary to physical sprain or injury at work. (T. 159). She prescribed Flexeril, and told plaintiff to take the medication at night because of the possible side effect of sleepiness and weakness. Dr. Remenson also referred plaintiff for physical therapy and told plaintiff that he should be on "light duty" for at least several weeks. *Id.*

When plaintiff returned to Dr. Remenson in December of 1999, he was complaining of abdominal discomfort. (T. 153). The doctor was initially concerned that plaintiff's pain might have indicated an inflammation of his gallbladder, however, it was determined that this was not the case, and Dr. Remenson referred plaintiff to Dr. Charles Wasicek, a Rheumatologist for an evaluation of whether plaintiff might have rheumatoid arthritis. (T. 153).

In November of 1999, plaintiff was also examined by Dr. Richard Withington, an orthopedic surgeon. (T. 214-16).  On November 16, 1999, plaintiff complained to Dr. Withington that plaintiff had discomfort in his neck, low back, and left shoulder. Dr. Withington stated that plaintiff was a "heavily muscled" man in no obvious discomfort, who had the appearance of a "body builder." (T. 214).  Plaintiff's lumbosacral x-rays were normal, and his cervical spine x-rays showed facet narrowing at C6-C7 and degenerative changes at C5-C6.  Dr. Withington suspected rheumatoid arthritis and noted that plaintiff was being referred to Dr. Charles Wasicek. (T. 215).

On November 30, 1999, Dr. Withington examined plaintiff again and stated that the laboratory tests showed no evidence of systemic arthropathy[1], but it appeared "clinically" that plaintiff was suffering from this arthropathy at that time. (T. 216). Plaintiff had general aching, and was a little tender over the trapezius muscle on the left.  The doctor noted that plaintiff would be referred to Dr. Wasicek.

Dr. Wasicek is clearly one of plaintiff's treating physicians.  Dr. Charles Wasicek's reports begin on June 21, 2000. (T. 131).  Dr. Wasicek's June 21, 2000 entry into the record consists of a prescription form that states that plaintiff should be "off work" until further notice. (T. 244).  There are many of Dr. Wasicek's progress notes in the record that are dated between June 21, 2000 and April 8, 2004.  Pages 121-31 and 238-44, cover the period between June 30, 2000 and December 27, 2000; pages 223-37, covering the period between January 21, 2001 and June 6, 2002; and

---

[1] Arthropathy is defined as any joint disease. DORLAND'S MEDICAL DICTIONARY 75 (Shorter Ed. 1980).

page 175 is a Residual Functional Capacity Evaluation (RFC) by Dr. Wasicek dated June 8, 2001.  After the ALJ hearing, plaintiff's counsel submitted additional evidence to the Appeals Council, and there are many of Dr. Wasicek's progress notes included in these additional exhibits in the record. (T. 425-86), covering the period between July 29, 2002 and October 20, 2003; and (T. 508), a report dated April 8, 2004.

On June 30, 2000, Dr. Wasicek reviewed plaintiff's history, noting that his job involved a great deal of very heavy lifting and pushing and pulling of weights over 100 pounds. (T. 130).  Plaintiff's job had placed a great deal of strain on his left shoulder and his arm.  On examination, plaintiff had some mild discomfort with lateral bending and rotation of his neck, and he had significant tenderness over his left shoulder with discomfort with anterior flexion and abduction of the left shoulder. (T. 130).  Plaintiff had tenderness over the bursa area and tenderness at his left elbow.  Dr. Wasicek stated that plaintiff had epicondylitis, tendinitis, bursitis of his left shoulder, and aggravation of his neck arthritis. (T. 131).

As a result of the June 30, 2000 examination, Dr. Wasicek decided to change plaintiff's medication from Vioxx to Celebrex, prescribed the use of a forearm epicondylitis band, wanted plaintiff to consider physical therapy, and prescribed an injection of his left elbow. (T. 131).  On July 11, 2000, plaintiff's elbow was injected with Aristospan, a steroid-type drug used to relieve inflammation.  On July 24, 2000, Dr. Wasicek noted that plaintiff had "some improvement", but continued to have aching in his left elbow and left shoulder, together with some discomfort in his neck. (T. 126).  Plaintiff had some decreased lateral bending and rotation of his neck with

some mild trapezius triggering.  Dr. Wasicek prescribed physical therapy.[2] (T. 126-27).

On September 1, 2000, Dr. Wasicek stated that plaintiff had some improvement in his elbow and his shoulder with physical therapy, but continued to have a lot of muscle spasms and discomfort at night. (T. 243).  Plaintiff's neck appeared to be the main problem at that time.  In fact, therapy for plaintiff's neck had to be stopped after three sessions because it was causing plaintiff to have headaches.  Dr. Wasicek's report also stated that there was a five percent reduction in anterior flexion and external rotation of plaintiff's left shoulder.  He still had decreased lateral bending and rotation of his neck to both sides with trapezius triggering. (T. 243).  Plaintiff had normal reflexes in both upper extremities.  Dr. Wasicek stated that he was going to refer plaintiff to Dr. Paul Curtis at the "Spine Center."

Plaintiff began going to the Spine Center on September 12, 2000.  There are various reports from the Spine Center, including reports by Dr. Paul Curtis, Dr. Walker R. Heap, and Nurse Practitioner, Donna Widrick. (T. 136-43).  Dr. Heap wrote the September 12, 2000 report, stating that plaintiff could flex his neck forward 45 degrees and get his chin on his chest. (T. 142).  Dr. Heap did note a significant weakness in plaintiff's grip on the left side, which was 61 pounds, as compared to the right side, which was 121 pounds. (T. 142).  There were other weaknesses noted between the left and the right side. (T. 142-43).  Dr. Heap also noted that the

---

[2] The court notes that Dr. Wasicek stated that plaintiff was experiencing some gastric discomfort due to the medications that plaintiff was taking, thus, many of the progress notes also mention this condition, which is not relevant to plaintiff's claims of disability. *See e.g.* T. 126.

circumference of the left forearm was ¾ to 1 centimeter smaller on the left side. (T. 143).  There was tenderness in various muscles on the left side, but no sensory deficit noted in either upper extremity. (T. 143).  Plaintiff's x-rays were normal, other than the "very slight decrease" in disc space between C6 and C7.  There was no definitive diagnosis, but Dr. Heap also recommended physical therapy and ordered an MRI.

On October 26, 2000, Dr. Heap stated that the MRI of plaintiff's cervical spine was entirely normal.  His right hand grip was 160[3] pounds, while his left hand grip was only 62 pounds, and plaintiff did have some atrophy. (T. 141).  Dr. Heap was concerned that there might be a soft tissue mass near plaintiff's brachial plexus causing the atrophy and weakness on his left side, and thus ordered another MRI of the brachial plexus area. (T. 141).  Dr. Heap also ordered a nerve conduction study to be done by Dr. Abdul Latif, a neurologist. On November 28, 2001, Dr. Heap noted that the MRI of the brachial plexus was negative.

On January 9, 2001, plaintiff was examined by neurologist Abdul Latif. (T. 132-33).  Dr. Latif noted that physical therapy to that point had caused headaches.  He stated, however, that plaintiff was not in any discomfort on examination. (T. 133).  Plaintiff had moderate tenderness in the left shoulder, and a motor examination did show weakness in plaintiff's left hand. (T. 133).  Plaintiff's muscle tone was normal, and his motor strength was 4/5.  There was mild give way weakness on the right and diminished sensation to pinprick in the left arm, mostly below the elbow. (T. 133).  Dr. Latif diagnosed chronic neck and left arm pain, probably myofacial in etiology.

---

[3] Later in the report, Dr. Heap stated that plaintiff's right grip was 163 pounds. (T. 141).

Dr. Latif performed EMG and nerve conduction studies, but the results were completely normal. (T. 134-35).

On February 7, 2001, Dr. Paul Curtis noted that plaintiff had an "extensive work up", but that it was "essentially negative." (T. 138). However, plaintiff did have atrophy on the left side of his upper extremity. Dr. Curtis noted that the "traction" attempted during physical therapy made plaintiff's pain worse and gave him headaches. He took plaintiff off Baclofen and continued the Vioxx. On February 26, 2001, Dr. Curtis noted that the thoracic MRI was negative, and that this would exclude neurogenic etiology for plaintiff's pain, but noted that his symptoms would indicate that the pain was related to nerves. (T. 137). On March 12, 2001, Nurse Practitioner Donna Widrick wrote that plaintiff's symptoms were unchanged, the TENS unit gave plaintiff a headache, and increasing his Vioxx did not help. (T. 136). Plaintiff had not responded to conservative treatment, and the doctors would be referring plaintiff to thoracic surgeon, William Burke.

Plaintiff continued to see Dr. Wasicek, even during the time that plaintiff was referred to these specialists. On December 22, 2000, Dr. Wasicek stated that in addition to the aching of plaintiff's left shoulder, he was having muscle spasms in the left side of his neck and his left upper arm which became worse if plaintiff did any lifting. (T. 123). Dr. Wasicek stated that plaintiff would be seeing a neurologist. Dr. Wasicek stated that plaintiff had a fifteen degree limitation of anterior flexion of his left shoulder, with tenderness in the same area upon internal and external rotation. Plaintiff had no cervical or axillary adenopathy. Dr. Wasicek increased plaintiff's

13

prescription for Flexeril and continued plaintiff on Vioxx.  Plaintiff was also taking

Tagamet at the time to reduce the gastric problems caused by the pain medications. (T.

123).  Dr. Wasicek commented plaintiff could try "trigger point injections" but would

wait and see "what the neurologist had to say."

Dr. Wasicek continued to find limitations and discomfort with lateral bending

and rotation of the neck to the left and anterior flexion of the left shoulder.  (T. 236-

37).  On January 24, 2001, Dr. Wasicek noted that plaintiff still had tenderness in his

left elbow. (T. 237).  On March 16, 2001, Dr. Wasicek stated that plaintiff had

moderate aching in his left shoulder, but also had some tingling in his left arm,

worsening when plaintiff had to reach up over his head. (T. 236).  At that time, Dr.

Wasicek stated that plaintiff would be evaluated for Thoracic Outlet Syndrome (TOS).

(T. 236). The Vioxx[4] had been helpful, although plaintiff continued to have

tenderness in his left shoulder, the AC joint, over the bursa, and periscapular

tenderness on the left side. (T. 236).

On March 22, 2001, plaintiff was examined by Dr. William Burke, a thoracic

surgeon. (T. 144-45).  Dr. Burke noted that plaintiff could not bring his head down to

his chest because it caused pain in his left shoulder. (T. 145).  He was able to turn his

head 45 degrees to the left, and he had tenderness in the left brachial plexus with some

increased spasm of the left trapezius.  Plaintiff's right arm was totally normal.  His

grip strength was greater on the right.  Dr. Burke did note that the pulse in plaintiff's

---

[4] The court also notes that the record contains evidence that plaintiff experienced abnormal liver function tests.  The doctors determined that this was probably due to the medication he was taking and ultimately decided to have plaintiff stop taking the Vioxx. (T. 235).

left arm diminished at 80 degrees and was absent at 90 degrees. (T. 145).  Plaintiff stated that this caused tingling in his fingers on the left.  Dr. Burke diagnosed a repetitive lifting injury to the brachial plexus, but he doubted that plaintiff had thoracic outlet syndrome.  Dr. Burke recommended a vascular evaluation, low grade physical therapy, ice, heat, low grade pain medication, and stated that he expected plaintiff's condition to last for another year.

On March 28, 2001, plaintiff was sent to Dr. O. Neulander for a vascular evaluation. (T. 146-47).  Dr. Neulander found no evidence of vascular disease.  He recommended surgery for plaintiff's left shoulder area.

On March 28, 2001, Dr. Wasicek still noted the limitations on plaintiff's left side, but stated that plaintiff had not had a change in strength there. (T. 235).  On May 10, 2001, Dr. Wasicek stated that plaintiff was having "discomfort" with his left shoulder with lifting, and that plaintiff was going to be referred to orthopedic surgeon John Mosher. (T. 234).  Plaintiff had "some" decreased lateral bending and rotation of his neck, a "mild limitation" of anterior flexion in his low back, and straight leg raising was negative. (T. 234).  Plaintiff could no longer take Vioxx, and Dr. Wasicek stated that he would continue plaintiff on Darvocet for the pain. (T. 234).  The doctor also recommended "some gentle exercises" for plaintiff's shoulder.

On May 30, 2001, plaintiff was examined by Dr. John Mosher. (T. 166-67).  Dr. Mosher noted that plaintiff was very muscular, and there was no diminished muscle mass on the left side. (T. 166).  Plaintiff could elevate his shoulder to 170 degrees on the right and 100 degrees on the left.  Dr. Mosher stated that "everything has give way

weakness on the left." (T. 166). The doctor noted that it was difficult to determine if the give way weakness was a pain related strength deficit. Dr. Mosher stated that plaintiff should be evaluated by a neurologist.

On May 30, 2001, plaintiff was evaluated by a consultative orthopedic surgeon, Dr. Berton Shayevitz. (T. 168-71). Dr. Shayevitz concluded that plaintiff was significantly limited in the use of his left upper extremities and neck motions. (T. 171). Dr. Shayevitz referred to plaintiff's impairment as "persistent pain syndrome" and stated that plaintiff would have some difficulty with fine motions with his left hand and arm. Plaintiff's strength was limited particularly with activities at or above shoulder height. (T. 171).

Dr. Mosher referred plaintiff to another neurologist, Dr. Robert E. Todd. Dr. Todd examined plaintiff on September 17, 2001. (T. 205-13). Dr. Todd also noted that plaintiff was very muscular and stated that he had ***not*** lost any muscle bulk. (T. 205). Plaintiff was then taking Tylenol with Codeine. (T. 206). Plaintiff was in "moderate distress", secondary to pain in his left upper extremity. When Dr. Todd performed his testing, he noted that as plaintiff's left arm was elevated, he lost his distal radial pulse, this motion produced pain, and his hand became mottled. This did not happen on the right side.

Dr. Todd thought that plaintiff might have thoracic outlet syndrome with a component of subclavian steal. (T. 207). Dr. Todd reviewed the MRI of the brachial plexus, and stated that the subclavian artery appeared normal, but believed that this could be due to the fact that plaintiff was in the supine position with his arms at his

sides, and the obstruction could be caused by the elevation of the arm. (T. 208).

On June 8, 2001, Dr. Wasicek completed a RFC evaluation, finding that plaintiff could lift and carry only five to ten pounds, stand and walk less than two hours per day, sit for less than six hours per day, and could not sit for long periods of time without changing positions. (T. 175).  Plaintiff was unable to push or pull and unable to perform repetitive motions with his upper extremities due to pain in his neck and arms, particularly on the left side.  The record contains reports from Dr. Wasicek through 2001 and into 2002.  Plaintiff exhibited the same symptoms of left-sided pain, and yet there was no definitive diagnosis for the cause of plaintiff's pain. (T. 227-30).

Between January 8, 2002 and January 15, 2002, plaintiff visited the Mayo Clinic and was examined by several doctors from different specialties. (T. 185-94).  Dr. Mark G. Costopoulos, from the Vascular Center summarized the findings of the Mayo Clinic doctors. (T. 187-88).  Dr. Costopoulos stated that all the laboratory tests had been essentially negative, including all MRI's; ultrasound for venous insufficiency; arterial studies; and EMG studies.  Plaintiff had no evidence of radiculopathy, myelopathy, or neuropathy.  His ECG was normal, and his chest x-ray was negative.

Dr. Costopoulos stated that his impression was that plaintiff had left shoulder pain with paresthesias, and the "working diagnosis" was impingement syndrome and possibly bursitis.  He suggested a different non-steroidal medication, a trial of steroid injections, and shoulder arthroscopy.  He also noted the liver function abnormality, but stated that it was possibly due to the medication. (T. 188).

Plaintiff went back to Dr. Mosher after plaintiff's visit to the Mayo Clinic. On April 16, 2002, Dr. Mosher noted the "unbelievably complex" history at the Mayo Clinic, with "no diagnosis." (T. 195). Dr. Mosher, however, did perform the steroid injections in shoulder as well as in the scapular area, with only limited relief. (T. 195-97). A subsequent bone scan was negative. (T. 197). On July 18, 2002, Dr. Mosher performed a shoulder arthroscopy. (T. 202-203). On July 30, 2002, plaintiff stated that his shoulder pain was "greatly improved", and was complaining of pain only when lifting or pushing heavy objects. (T. 199). Plaintiff was told not to do any heavy lifting or pushing for the next four weeks.

On August 27, 2002, Dr. Mosher noted that although plaintiff had some relief in his shoulder, he was experiencing rib cage pain. (T. 277). Dr. Mosher referred plaintiff to Dr. P.B. Kreienberg for evaluation of possible Thoracic Outlet Syndrome.[5] Plaintiff was examined by Dr. Kreienberg, who ordered a venogram on November 26, 2002. (T. 394-95). The venogram showed moderate to severe stenosis of the left subclavian vein at the region of the thoracic outlet, worsening on abduction, consistent with an obstruction in this region. (T. 394-95).

Plaintiff then underwent decompression surgery in December of 2002. (T. 390). Plaintiff's first rib was removed on the left, leaving adequate room for the vein and relieving the compression. (T. 393). In a note, dated December 18, 2003, Dr.

---

[5] The court notes that Dr. Mosher's medical notes from August and September of 2002 were the last medical records that were before the ALJ when he made his decision. (T. 34). Plaintiff's counsel then submitted a substantial amount of additional medical evidence to the Appeals Council for its review. All the records from (T. 280-508) are records that were not before the ALJ for his review, but were subsequently accepted as Appeals Council Exhibits.

Kreienberg stated that "[a]ll in all, things look pretty good." (T. 498).  Dr. Kreienberg stated that plaintiff still had some numbness and weakness in his hand, however, the surgery made plaintiff no worse, and instead, he obtained some small improvement in his shoulder.  There was no supraclavicular tenderness. *Id.*

Plaintiff participated in various periods of physical therapy, some with more success than others.  In August of 2002, plaintiff began physical therapy after his shoulder surgery. (T. 358).  Between December of 2002 and March of 2003, plaintiff underwent occupational therapy. (T. 436-67).  These periods of therapy appeared to improve plaintiff's abilities slightly.  On January 20, 2003, Physical Therapist Fred Gill stated that plaintiff was making slow progress, but did have an increased range of motion in the shoulder and neck area. (T. 382).  On January 16, 2003, the therapist indicated that plaintiff's grip strength and his range of motion had increased. (T. 439).

Between June 26, 2003 and January 30, 2004, plaintiff was seen by Dr. Allen Carl, an orthopedic surgeon. (T. 487-96).  Plaintiff told Dr. Carl that in February of 2003, his leg completely "went out." (T. 487).  Dr. Carl stated that the thoracic outlet surgery helped his chest, but that his back symptoms were persisting. (T. 487).  Dr. Carl's assessment was "questionable thoracolumbar dysfunction." (T. 487).  Dr. Carl suggested, and later performed three facet block injections in an attempt to determine where plaintiff's pain originated and to relieve it so that plaintiff could strengthen the muscles around the joint. (T. 488-91, 492-94).  A whole body bone scan performed on July 10, 2003 was normal. (T. 492).

3.    **New and Material Evidence**

Plaintiff has made a motion for the court to "consider" new and material evidence. (Dkt. No. 18).  It appears that counsel believes that if this court accepts the "new evidence" it can be considered along with the evidence of record.  However, the Social Security Act does not permit that type of consideration.  If the court finds that the evidence is new and material, the only option for the court is to remand the action to the Commissioner for consideration in the first instance.

The Social Security Act provides that a court may ***remand*** a case to the Commissioner to consider additional evidence, but only if the evidence is new, material, and there is good cause for failure to incorporate that evidence into a prior proceeding. 42 U.S.C. § 405(g)(sentence six).  The Second Circuit has developed a three-part showing that is required to support a sentence six remand. *Tirado v. Bowen*, 842 F.2d 595, 597 (2d Cir. 1988).  First, the evidence must be "new" and not merely cumulative of what is already in the record. *Id.* (citing *Szubak v. Secretary of Health & Human Services*, 745 F.2d 831, 833 (3d Cir. 1984)).

Second, in order for the new evidence to be "material," it must be ***both relevant to the claimant's condition during the time period for which benefits were denied and probative.***" *Id.* (citing *Cutler v. Weinberger*, 516 F.2d 1282, 1285 (2d Cir. 1975)).  The Second Circuit has also held that the concept of "materiality" requires a finding that there is a reasonable possibility that the new evidence would have influenced the Commissioner to decide the claimant's application differently. *See Jones v. Sullivan*, 949 F.2d 57, 60 (2d Cir. 1991).  Finally, the plaintiff must show that there is good

20

cause for failing to present the evidence earlier. *Lisa v. Secretary of the Dep't of Health & Human Services*, 940 F.2d 40, 43 (2d Cir. 1991)(quoting *Tirado*, 842 F.2d at 597).

Although plaintiff's counsel argues that this evidence is both new and material and that there is good cause for the failure to incorporate the evidence into the prior proceedings, this court cannot agree with any of plaintiff's argument in this regard. Some of this batch of unnumbered medical records that have been submitted consist of old records, predating the ALJ's decision, relating to examinations that plaintiff underwent. The first document consists of the laboratory reports from plaintiff's Mayo Clinic visit in January of 2002. Since the record already contains the doctors' written conclusions based on these laboratory reports, this document is neither new nor material. It is cumulative of evidence already in the record. Regardless of the fact that the plaintiff's counsel may not have had the "complete" report prior to the Appeals Council decision, this court does not find that there is good cause for the failure to include it in the prior proceedings.

Some of the other documents are simply additional reports by plaintiff's other doctors from the same time period as the reports that are already of record. There are three reports from Dr. Wasicek, dated between July 16, 2003 and January 14, 2004. The record already contains reports from Dr. Wasicek from late 2003 and up to April of 2004. Clearly, the reports that plaintiff's counsel has now submitted are not "new" and there is no good cause for failure to provide them previously. There are many records from Dr. Wasicek, and the fact that these three office notes were not included

in the substantial number of documents already provided does not rise to the level of good cause.

Plaintiff's counsel has also submitted copies of prescription slips from 2003 and 2004, showing the same medications that plaintiff had already been prescribed. Once again, there is no showing that this evidence is new or material. To the extent that the evidence post-dates the Commissioner's decision, it can be considered "new", but clearly if the Commissioner was well-aware of plaintiff's medications then there is no reason to send the case back for consideration of this evidence. It would have made no difference to the decision.

Plaintiff's counsel has also submitted records of an impairment that was never mentioned or considered in the previous record. These documents are from 2004. Although they may be new, they have no relevance to the Commissioner's decision. Whether plaintiff now has additional impairments or may now be disabled due to a worsening of his condition is not relevant to whether the Commissioner's decision was supported by substantial evidence. If in fact, plaintiff's condition has gotten worse, he may reapply for benefits alleging a different onset date.

Plaintiff's counsel has also included the report of a new consultative physician, dated November 7, 2004 and another narrative report by Dr. Wasicek, dated January 26, 2005, stating that plaintiff is disabled. The court finds that neither report constitutes new and material evidence. This is particularly so because the new consultative physician's report seems to utilize Workers' Compensation terminology, stating that he would give plaintiff a "marked partial permanent disability" and then

22

states that "[plaintiff] *could work* with the restriction to *light duty*.  Nothing that requires the use of the left arm, and I would put a five pound restriction on his right arm." (emphasis added).  Plaintiff himself testified at the hearing that he could lift twenty five pounds with his right arm.  Thus, this report would not have changed the Commissioner's decision.

Finally, the record already contains a substantial number of Dr. Wasicek's reports, including Dr. Wasicek's RFC.  The January 26, 2005 report would not have changed the Commissioner's decision.  In addition, the report states both that plaintiff "easily" meets the classification of "marked partial disability" and then states that he also meets the criterial of "total disability."  Again, it appears that Dr. Wasicek is using Workers' Compensation terminology.  As stated by the ALJ in his decision, another agency's determination of disability is not binding on the Social Security Administration, particularly because the *legal* definition of disability is different for each agency.  The Workers' Compensation standards are different that those for Social Security Disability. *Grey v. Chater*, 903 F. Supp. 293, 301 n.8 (N.D.N.Y. 1995).

Thus, plaintiff's submissions do not meet the standard for a remand to consider new and material evidence, and plaintiff's motion (Dkt. No. 18) may be denied, and the court may proceed to consider plaintiff's other arguments.

## 4.   <u>Pain</u>

"An [ALJ] may properly reject [subjective complaints] after weighing the objective medical evidence in the record, the claimant's demeanor, and other indicia of credibility, but must set forth his or her reasons 'with sufficient specificity to enable us

to decide whether the determination is supported by substantial evidence.'" *Lewis v. Apfel*, 62 F. Supp. 2d 648, 651 (N.D.N.Y. 1999)(quoting *Gallardo v. Apfel*, No. 96 CIV 9435, 1999 WL 185253, at *5 (S.D.N.Y. March 25, 1999)).  To satisfy the substantial evidence rule, the ALJ's credibility assessment must be based on a two step analysis of pertinent evidence in the record.  *See* 20 C.F.R. §§ 404.1529, 416.929; *see also Foster v. Callahan*, No. 96-CV-1858, 1998 WL 106231, at *5 (N.D.N.Y. March 3, 1998).

First, the ALJ must determine, based upon the claimant's objective medical evidence, whether the medical impairments "could reasonably be expected to produce the pain or other symptoms alleged...."  20 C.F.R. §§ 404.1529(a), 416.929(a). Second, if the medical evidence alone establishes the existence of such impairments, then the ALJ need only evaluate the intensity, persistence, and limiting effects of a claimant's symptoms to determine the extent to which it limits the claimant's capacity to work. *Id.* §§ 404.1529(c), 416.929(c).

When the objective evidence alone does not substantiate the intensity, persistence, or limiting effects of the claimant's symptoms, the ALJ must assess the credibility of the claimant's subjective complaints by considering the record in light of the following symptom-related factors: (1) claimant's daily activities; (2) location, duration, frequency, and intensity of claimant's symptoms; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness, and side effects of any medication taken to relieve symptoms; (5) other treatment received to relieve symptoms; (6) any measures taken by the claimant to relieve symptoms; and (7) any other factors

concerning claimant's functional limitations and restrictions due to symptoms. *Id.* §§ 404.1529(c)(3), 416.929(c)(3).

In his decision, the ALJ did ***not*** completely discount plaintiff's complaints of pain. (T. 42).  The ALJ found that plaintiff had medically determinable impairments that could produce pain, however, the ALJ noted inconsistencies in the record that detracted from plaintiff's credibility regarding the extent of the pain alleged.  These inconsistencies included plaintiff's contemporaneous statements to physicians and his testimony at the hearing. (T. 42-43).  It is conceded that plaintiff has left sided pain and weakness.  The ALJ took that into consideration when he made his decision regarding plaintiff's residual functional capacity.

The ALJ's decision regarding plaintiff's pain and credibility is supported by substantial evidence.  Plaintiff himself testified at the hearing that he could lift 25 pounds with his right hand.  Tests of plaintiff's grip strength all showed substantial strength in his right versus his left hand. (T. 141).  Dr. Curtis noted on October 26, 2001 that plaintiff's grip strength on the right was 160 pounds while on the left it was only 62 pounds.  On March 22, 2001, Dr. Burke stated that plaintiff's right arm was "totally normal." (T. 145).  On January 9, 2001, Dr. Heap stated that plaintiff had a "little" exacerbation of the symptoms on his left side over the holidays because he had done "a lot of walking in the mall on the hard floor." (T. 139).

Dr. Shayevitz noted on May 30, 2001 that plaintiff told him that neither his shoulder pain nor his back pain were aggravated by sitting or standing. (T. 169).  On September 17, 2001, Dr. Todd stated that plaintiff had not lost any muscle bulk and

that he was in "moderate distress" secondary to pain. (T. 205-06).  On July 23, 2002,

five days after plaintiff's shoulder surgery, he told Dr. Mosher that the pain in his

shoulder had improved. (T. 198).  Two weeks after the surgery, on July 30, 2002,

plaintiff told Dr. Mosher that the shoulder pain was "***greatly improved***," and he

complained of pain only when lifting or pushing ***heavy*** objects. (T. 199)(emphasis

added).  Dr. Mosher found good range of motion in the left shoulder, and plaintiff was

told not to do any "heavy lifting" or pushing for the next four weeks. (T. 199).

The court would point out that plaintiff was examined by Dr. Wasicek on July

29, 2002, the day before the examination in Dr. Mosher's office. (T. 425).  Dr.

Wasicek's examination notes are quite different than those from Dr. Mosher's office

from July 30, 2002.  Dr. Wasicek's report mentions the surgery, but still states that the

incision "looks to be healing," while the ***next day***, Dr. Mosher's report (written by

Brad Gerber, an orthopedic resident working with Dr. Mosher), stated that the

incisions were "well healed." (T. 199, 425).  Dr. Wasicek's report stated that plaintiff

still had limitations without specifying what those limitations were, while the report

from Dr. Mosher's office stated that plaintiff's limitations were ***only*** with heavy lifting

and pushing. *Id.*  There appear to be conflicts in the reports, and the ALJ was entitled,

based on inconsistencies such as these, to discount the ***extent*** of plaintiff's claims of

pain.

In any event, the ALJ did acknowledge that plaintiff had severe limitations on

the left side of his body, and that was the reason that the ALJ called a vocational

expert at the hearing.  Thus, the ALJ's finding that plaintiff's pain was not as severe as

26

plaintiff alleged is supported by substantial evidence.

5.   **Treating Physician**

The medical conclusions of a treating physician are controlling if well-supported by medically acceptable clinical and laboratory diagnostic techniques and are not inconsistent with the other substantial evidence in the record.  20 C.F.R. §§ 404.1527(d)(2); 416.927(d)(2).  *See also Schaal v. Apfel*, 134 F.3d 496, 503 (2d Cir. 1998); *Rosa v. Callahan*, 168 F.3d 72, 78-79 (2d Cir. 1999).  An ALJ may not arbitrarily substitute his own judgment for competent medical opinion.  *Rosa v. Callahan*, 168 F.3d at 79 (citations omitted).   If the treating physician's opinion is not given "controlling weight," the ALJ must assess the following factors to determine how much weight to afford the opinion: the length of the treatment relationship, the frequency of examination by the treating physician for the condition(s) in question, the medical evidence supporting the opinion, the consistency of the opinion with the record as a whole, the qualifications of the treating physician, and other factors tending to support or contradict the opinion.  20 C.F.R. §§ 404.1527(d)(2-6); 416.927(d)(2-6).  Failure to follow this standard is a failure to apply the proper legal standard and is grounds for reversal. *Barnett v. Apfel*, 13 F. Supp. 2d 312, 316 (N.D.N.Y. 1998) (citing *Johnson v. Bowen*, 817 F.2d at 985).

Plaintiff claims that the ALJ improperly failed to accept Dr. Wasicek's RFC, dated June 8, 2001.  The ALJ stated in his opinion that he was discounting Dr. Wasicek's opinion of "total" disability as well as the RFC dated June 8, 2001 because he was the only doctor of record to state that plaintiff was "totally" disabled and his

findings conflicted with other physicians of record who were specialists in the impairments from which plaintiff was suffering. (T. 42). The ALJ noted the inconsistency between Dr. Wasicek's opinion and Dr. Mosher's opinion in July of 2002. The ALJ also pointed out that although Dr. Wasicek was a rheumatologist, plaintiff did **not** have rheumatism. (T. 42). Dr. Mosher was also a treating physician and actually performed shoulder surgery on plaintiff. The ALJ's decision to credit Dr. Mosher's opinion of plaintiff's condition after surgery is supported by substantial evidence.

Plaintiff also states in his brief that on April 8, ***2004***, Dr. Wasicek noted that plaintiff's condition had ***deteriorated*** to the point where he could not stand or sit for more than 20 minutes and could not walk for more than 15 minutes. Plaintiff's Brief at 17-18 (citing T. 508). The court would first note that if plaintiff's condition ***deteriorated***, this is not relevant to plaintiff's RFC during the period in question. Additionally, the ALJ did not have this report when writing his decision, dated in October of ***2002***. The Appeals Council accepted and considered this evidence, however, even assuming that the Appeals Council found that plaintiff's condition deteriorated, it would not have changed the Appeals Council's decision that plaintiff was not disabled during the appropriate time period.

In his brief, plaintiff lists many laboratory tests and findings of limitations in different degrees of flexion and extension as supporting Dr. Wasicek's RFC. Plaintiff's Brief 18-19. However, plaintiff does not mention all the scans, x-rays, and MRI results that were ***completely normal***, and the court would point out that the ALJ

28

*accepted* the fact that plaintiff was severely limited on the left side.  Thus, the listing of limitations by plaintiff is not inconsistent with the ALJ's finding that plaintiff was not disabled for purposes of Social Security benefits.

Plaintiff cites reports noting that plaintiff had atrophy. Plaintiff's Brief at 18). Although plaintiff states that the opinion of atrophy was authored by Dr. Burke and cites (T. 145-47), the court notes that it was Dr. Neulander who mentioned "atrophy" to the left arm.[6] (T. 147).  In September of 2000, Dr. Curtis mentioned that plaintiff's left forearm was ¾ to 1 *centimeter* smaller than the right. (T. 143).  On December 7, 2001, Dr. Wasicek noted that plaintiff had lost "about an *inch*" in his biceps and forearm muscles, but on February 14, 2002, Dr. Wasicek stated that plaintiff had "some" weakness in his left arm, but he was *not* having "progressive muscle wasting. (T. 225, 228)(emphasis added).

The court would also point out that on September 17, 2001, Dr. Todd noted that he "*did not detect any atrophy in any muscle group*." (T. 206)(emphasis added). Although Dr. Todd stated that he could not elevate plaintiff's left arm secondary to the discomfort, "he was strong at grip." (T. 206.  Dr. Todd suspected, and the evidence ultimately showed that plaintiff was suffering from Thoracic Outlet Syndrome[7] for which plaintiff underwent surgery.  The court would point out that the fact that

---

[6] In the same report, Dr. Neulander, who examined plaintiff only for a vascular evaluation, stated that plaintiff did not have any vascular insufficiency. (T. 147).

[7] The diagnosis of Thoracic Outlet Syndrome was not made definitively until after the ALJ's decision, and plaintiff's visit to the Mayo Clinic in January of 2002 did not result in the diagnosis of Thoracic Outlet Syndrome. (T. 187-88).  The "working diagnosis was "impingement syndrome." (T. 188).

plaintiff had Thoracic Outlet Syndrome also does not mean that he was disabled by the condition.

Basically, there are conflicting medical reports in the record, and genuine conflicts in the record are for the Commissioner, not the court, to resolve. *Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002)(citation omitted).  Thus, the ALJ's rejection of the extent of Dr. Wasicek's limitations is supported by substantial evidence.

**6.**  **Severity of Impairments**

The definition of a severe impairment is one that significantly limits the plaintiff's physical or mental ability to do basic work activities. 20 C.F.R. §§ 404.1520(c), 404.1521.  Basic work activities are defined as the abilities and aptitudes necessary to do most jobs.  They include physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling. 20 C.F.R. § 404.1521 (b)(1), (2).  Basic work activities also include mental functions required for work. *Id.* § 404.1521(b)(3)-(6).

Plaintiff in this case argues that the ALJ erred in determining that plaintiff's "neck" impairment was not severe.  Plaintiff's counsel cites a variety of reports in support of the proposition that plaintiff's neck impairment is severe. Plaintiff's Brief at 22-23.  It is unclear what plaintiff's counsel is arguing, since the ALJ specifically found that plaintiff's shoulder impairment ***and*** plaintiff's degenerative disc disease ***were*** severe impairments. (T. 35-36).  In making his argument, plaintiff's counsel cites to 1999 x-rays of plaintiff's cervical spine, showing degenerative changes at C5-6 and

facet narrowing at C6-C7. (T. 215).  The cervical spine is the neck area, thus, the degenerative disc disease to which the ALJ was referring was in plaintiff's neck.

The ALJ found that plaintiff's low back pain was not a severe impairment because plaintiff had never been medically treated for low back pain, and none of the medical reports would support a significant "vocational impact" due to this alleged impairment. (T. 36).  Thus, counsel's argument regarding the severity of plaintiff's neck impairment is moot because the ALJ did consider the neck impairment severe.

## 7.   **Residual Functional Capacity (RFC)**

In rendering an RFC determination, the ALJ must consider objective medical facts, diagnoses and medical opinions based on such facts, as well as a plaintiff's subjective symptoms, including pain and descriptions of other limitations. 20 C.F.R §§ 404.1545; 416.945. *See also Martona v. Apfel*, 70 F. Supp. 2d 145 (N.D.N.Y. 1999)(citing *LaPorta v. Bowen*, 737 F. Supp. 180, 183 (N.D.N.Y. 1990)).  RFC can only be established when there is substantial evidence of each physical requirement listed in the regulations. *LaPorta v. Bowen*, 737 F. Supp. at 183.   Furthermore, an ALJ must specify the functions plaintiff is capable of performing, and may not simply make conclusory statements regarding a plaintiff's capacities.  *Verginio v. Apfel*, 1998 WL 743706 (N.D.N.Y. Oct. 23, 1998); *LaPorta v. Bowen*, 737 F. Supp. at 183.

In this case, the ALJ found that plaintiff could perform light work, but that he had additional limitations, and could not perform the "full range" of light work. (T. 45, 47).  The ALJ rejected both Dr. Wasicek's RFC of June 8, 2001 as well as the RFC of the non-examining State Agency disability analyst. (T. 42-43).  The ALJ found that

plaintiff's restrictions were not as severe as those articulated by Dr. Wasicek, but more severe than those outlined by the Disability Analyst. (T. 43).  The ALJ reasoned that additional evidence had been received since the opinion of the Disability Analyst was rendered, and the ALJ incorporated the additional restrictions into his RFC finding.

It is the responsibility of the ALJ to determine RFC. 20 C.F.R. § 404.1546(c). He is required to consider medical data, but draws his own conclusions as to whether that data indicates that plaintiff is disabled. *Guadalupe v. Barnhart*, 04-CV-7644, 2005 U.S. Dist. LEXIS 17677, *17-18 (S.D.N.Y. Aug. 24, 2005)(citing *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999).  The Second Circuit has also stated that the ALJ may rely upon what is absent from the record to determine plaintiff's RFC. *Id.* (citing *Diaz v. Shalala*, 59 F.3d 307, 315 (2d Cir. 1995).

In determining plaintiff's RFC in this case, the ALJ specifically took into account the limitations imposed by plaintiff's left sided pain, weakness, numbness, and lack of dexterity. (T. 38).  The ALJ stated that this finding was based on the medical evidence of record, including plaintiff's statements about his ability to perform the activities of daily living. (T. 38).  Although plaintiff testified that he could only walk one block before suffering low back pain, the court notes that plaintiff was not being treated for low back pain.  Most of the enormous record in this case is devoted to plaintiff's shoulder and neck impairments, and Dr. Shayvitz stated in his consultative examination that plaintiff's arm and shoulder pain were "***not increased by sitting or standing***." (T. 169).  Dr. Shayvitz did mention plaintiff's back pain, but noted that it was "***not increased by sitting, standing, walking, or bending***." *Id.*

Thus, the ALJ's finding that plaintiff could stand or walk with normal breaks for less than four hours in an eight hour work day as well as sit with normal breaks for six hours in an eight hour work day is supported by substantial evidence. As stated above, the ALJ did find that plaintiff was limited with pushing and pulling with the left upper extremity and was limited in his ability to reach, handle, finger, and feel on the left side. (T. 38). The ALJ also found that plaintiff had no restrictions on his ability to climb, balance, stoop, kneel, crouch, and crawl. *Id.* The ALJ's findings regarding plaintiff's RFC, together with his finding that plaintiff was exaggerating his symptoms, as stated above, are supported by substantial evidence.

## 8.   <u>Vocational Expert (VE)</u>

If a plaintiff's non-exertional impairments "significantly limit the range of work" permitted by the plaintiff's exertional limitations or plaintiff's ability to perform the full range of an exertional category of work is significantly limited in any way, then the ALJ may not use the Medical-Vocational Guidelines exclusively to determine whether plaintiff is disabled. *Bapp v. Bowen*, 802 F.2d 601, 606 (2d Cir. 1986). If the plaintiff's range of work is significantly limited by his non-exertional impairments, then the ALJ must present the testimony of a vocational expert or other similar evidence regarding the availability of other work in the national economy that plaintiff can perform. *Id.* A vocational expert may provide testimony regarding the existence of jobs in the national economy and whether a particular claimant may be able to perform any of those jobs given his or her functional limitations. *See Rautio v. Bowen*, 862 F.2d 176, 180 (8th Cir. 1988); *Dumas v. Schweiker*, 712 F.2d 1545,

1553-54 (2d Cir. 1983).

Although the ALJ is initially responsible for determining the claimant's capabilities based on all the evidence,[8] a hypothetical question that does not present the full extent of a claimant's impairments cannot provide a sound basis for the VE's testimony. *See De Leon v. Secretary of Health and Human Services*., 734 F.2d 930, 936 (2d Cir. 1984); *Lugo v. Chater*, 932 F. Supp. 497, 503-04 (S.D.N.Y. 1996).  The Second Circuit has stated that there must be "substantial record evidence to support the assumption upon which the vocational expert based her opinion." Dumas, 712 F.2d at 1554.

Because plaintiff's ability to perform the full range of light work was substantially diminished by his additional limitations, the ALJ did not use the Medical Vocational Guidelines to make his determination that plaintiff could perform substantial gainful activity notwithstanding his limitations.  The ALJ called a VE to testify at the hearing.  The VE was asked hypothetical questions by both the ALJ and plaintiff's counsel.  Plaintiff now argues that the VE was misinformed as to plaintiff's RFC and therefore, did not render an opinion supported by substantial evidence.

In this case, the ALJ first presented the vocational expert with a hypothetical utilizing the RFC discussed above. (T. 528-29).  The ALJ also stated that in addition to plaintiff's other limitations, he could occasionally climb, balance, stoop, and kneel, could never crawl, but could occasionally crouch. (T. 529).  The VE testified that, given that RFC, plaintiff could be a surveillance system monitor, a school bus

---

[8] *Dumas*, 712 F.2d at 1554 n.4.

monitor, and a teacher's aide. (T. 530).  These jobs could be performed using only one hand. (T. 530).

Because this court has found that the ALJ's determination of RFC is supported by substantial evidence, then the hypothetical posed by the ALJ to the VE is also supported by substantial evidence.  The court would point out, however, that plaintiff's counsel had the opportunity at the hearing to propose additional limitations to the VE.  Each time that plaintiff's counsel proposed an additional limitation, the VE stated that plaintiff could still perform at least one of the jobs mentioned. (T. 534). Plaintiff's counsel asked if the performance of the surveillance system monitor job would be affected by the inability to turn one's head. (T. 534).  The VE responded that if he plaintiff could not turn his head "at all", this might affect his ability to perform the job, but if he could not turn his head on a repeated basis, this would not affect his ability to perform the job. (T. 535)

There was absolutely no evidence that plaintiff could not turn his head at all, thus, the additional restriction posed by counsel did not limit his ability to perform the specified job.  The inability to write with plaintiff's dominant hand would also not affect his ability to perform the work. (T. 535).  The only thing the VE stated might affect plaintiff's ability to work was the alleged lack of concentration, however, nowhere in the record is there medical evidence that plaintiff lacks concentration because of his pain.  Plaintiff testified that he has trouble concentrating because of the pain, but as stated above, the ALJ properly found that plaintiff was overstating his symptoms.  Thus, the VE's hypothetical was proper, and the ALJ's decision that

plaintiff was not disabled is supported by substantial evidence.

     **WHEREFORE,** based on the findings above, it is


     **RECOMMENDED,** that plaintiff's motion to consider new evidence (Dkt. No.

18) be **DENIED**, and it is

     **RECOMMENDED**, that the decision of the Commissioner be **AFFIRMED**,

and that the complaint (Dkt. No. 1) be **DISMISSED**.

     Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten days within which to file

written objections to the foregoing report.  Such objections shall be filed with the

Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN**

**DAYS WILL PRECLUDE APPELLATE REVIEW.**  *Roldan v. Racette*, 984 F.2d

85 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d

15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

Dated: March 31, 2006

                         _____

                         Hon. Gustave J. DiBianco
                         U.S. Magistrate Judge